Our next case this morning is number 24, 1758, Rino v. Army. Okay, Mr. Sternberg. Thank you, Your Honor. May it please the Court. I'm Jonathan Sternberg and I represent the petitioner, Dennis Rino. The Army couldn't remove Mr. Rino in this process that was infected by undisclosed ex parte information and evidence that he was never allowed to confront and a new removal proceeding is required. There are two species of due process violations that we address in our brief. First, that the deciding official, Colonel Iverson, received and considered ex parte information that was never provided to Mr. Rino or his counsel, much of which came from the adversary, the charging official, Mr. Dills. And second, that the administrative judge relied on affidavits from witnesses who Mr. Rino was prevented from deposing. And I'll start with the ex parte communications. Didn't Colonel Iverson indicate that he didn't consider those ex parte communications? He did that in a later affidavit and I'm going to address that, Your Honors. The affidavit that was filed from him in front of the administrative judge, he did say he didn't consider those. The problem with that, though, is the agency tries to make this about a credibility determination. In the McGuffin case, which we Why is it not a credibility determination? So here you have two, you have an affidavit that he filed after the due process issues became apparent, after Mr. Rino had challenged this. Previously, though, you have a deposition, a sworn deposition, from Colonel Iverson, in which he states specifically that he did consider these. In fact, I want to point out to the courts. I mean, they're conflicting statements, but the A.J. made a credibility determination and that's hard to review. So in McGuffin, in 2013, this court, or sorry, 2019, this court held that where you have statements from, a later statement from a witness and an objective statement somewhere else in the record earlier, that the board can't insulate this as a credibility determination. And it's not just the earlier The A.J. made that determination. In McGuffin, the A.J. made the same determination and this court reversed and held that there was still clear error. But I want to point, it's not just the earlier deposition. That's not the only piece of evidence about this. The objective record also corroborates one of the three ex parte communications, because we have three at issue. The first are these statements, and I think that's what Your Honor was referring to, the statements from the complaining witness and these two other witnesses, Dodd and Smith. But there's also communications from Mr. Dills, the charging official, the person who actually filed the notice of removal and instituted these proceedings, that Mr. Dills was communicating with the deciding official, Colonel Iverson, during the proceedings below and, in fact, immediately before those proceedings. And that's crucial here, too, because in his affidavit, Colonel Iverson doesn't actually address all of that. So there are two species of those. One is these charges that were brought against Mr. Rino in state court in Missouri that Mr. Dills, specifically in his deposition, I mean openly, says that he discussed those charges with Colonel Iverson while the removal proceedings were ongoing. That's 6926 to 27 of the appendix. In his own deposition, Colonel Iverson testifies, if he, meaning Mr. Dills, said he did that, I'm sure we discussed it then. The objective record also confirms this. There's a letter. It's the same day that Colonel Iverson issues the removal decision. He also issues what's called an installation bar letter, which says I'm barring you from Fort Leonard Wood. That states, quote, your misconduct has escalated to the point where the Pulaski County prosecuting attorney has filed stalking and harassment charges against you. That's page 166 of the appendix. Now, the agency argues that, well, he didn't write this, so he didn't know. But he actually issued that decision to Mr. Rino, and Mr. Rino signed it at the same time. So clearly he knew about that, and he doesn't address that in his affidavit. I think that's really important because in, for example, in the Sullivan case in 1983, this court held that ex parte communications from an employee's adversary, which is what happened here, to the decision maker, invalidate the proceedings because they undermine the neutrality of the process. And the other species, and I think this is the most troubling of all, is Mr. Dills admitted that he was attempting to get Mr. Rino federally prosecuted by the staff adjutant, the SJA they call it. It's a military lawyer. It was trying to get him prosecuted in federal court, and he encouraged Colonel Iverson to do the same and speak with the staff judge advocate about prosecution. And Mr. Dills again openly admits this in his deposition. It's page 6924-25. Colonel Iverson doesn't address this at all in his affidavit. And further, the ALJ doesn't address it at all in her decision, and then the board simply says, even though Mr. Rino brought all of this up, the board simply says summarily we find no due process violation. So on this record, at the very least, that, and that's almost exactly on point with Sullivan. And also there's a case we cite. It's called Federal Education Association. It's a very long name. It was later vacated, but the reasoning in it stands. It was vacated on other grounds. There you had a — It was vacated on other grounds. It was just vacated. Fair enough, Your Honor. It was vacated. But I'd encourage the court to read it anyway because its reasoning is — I'm aware, Your Honor. I know that. And Judge Rino joined it, too. But in that case, you had a teacher who was being removed from her position at I think it was Fort Knox, and there was a letter that had been written by the charging official to the deciding official before the proceedings were instituted also trying to get her in trouble. And this court held that that was a due process violation for very much the same reasons. And here you have the same thing. You have Mr. Dills who is, you know, in — he testifies that, well, as early as 2012, I considered instituting removal proceedings against Mr. Rino. And he then, you know, is communicating with the deciding official saying, hey, I want him to get prosecuted in federal court, so let's go to the staff judge advocate and have him do that. And he testified that at that time he had been considering removal proceedings. And also the removal proceedings only began just shortly after that anyway in November of 2013. So not all of this is addressed by this supposed credibility determination of this later affidavit. Those two things certainly are not. And that's a real Sullivan problem here. But even as to that first issue, I do want to bring this up because it is pretty glaring to me. So on page 4808 of the appendix, Colonel Iverson is asked whether he had considered the statements of these two witnesses about this one incident or two incidents involving Mr. Rino allegedly. And he answers, quote, they were considered obviously. In its brief on page 35 of the red brief, citing that same appendix page, the agency says, quote, Mr. Rino responded, they were considered obviously. They filed what they termed a corrected brief earlier this week. Well, it doesn't correct that. Page 4808, it's in black and white. This is not Mr. Rino saying that. It is Colonel Iverson himself saying that these things were considered obviously. That's not ambiguous. But they don't really answer the McGuffin problem. They don't really answer the Sullivan problem. Instead, they simply say, well, Colonel Iverson didn't consider these things, and it's a credibility determination. But that's just not true. At least for, I appreciate that that's an argument they can have for that first species of ex parte communications, but not for the second two. Well, the record shows that Colonel Iverson knew about this evidence and the statement that he didn't consider it. I think it wasn't just that. It's that he did not consider it in making his final determination. That's true, too. I mean, there's no dispute that this evidence was out there. The affidavits and all this other information. The question is whether it actually formed a basis for the decision of Colonel Iverson. Two responses to that, Your Honor. First, I'm going to quibble a little bit that there's no dispute that this evidence was out there. We certainly don't dispute that it was out there. I think Colonel Iverson admits it in his deposition. The agency says that there's no proof that he had seen these statements before. But regardless, I think the problem that your question really goes to is the standard that this Court uses in determining prejudice in a case like this. The Court held in stone that the standard is whether the communication, quote, was of the type likely to result in undue pressure on the deciding official. There's no requirement. Johnson goes into this in more detail, Johnson from 2022. There's no requirement that we have to show that he actually relied on it. And the case we were discussing before that was vacated, Federal Employment, sorry, Federal Education Association, also goes into this. So even if Colonel Iverson says, well, I didn't consider it, in none of those cases, Stone, Johnson, Young, Young is a good one for that, too, because there you have witnesses who were interviewed for the first time ex parte by the deciding official, even though they've made statements in the record, apparently. And the deciding official later said, well, I didn't rely on those. This Court still reversed and ordered a new removal proceeding for the same reason, that it's of the type likely to result in undue pressure. If the Court has no further questions on that, I'd like to move briefly to the second species of due process violation, which is these affidavits that the complaining witness and other witnesses provided through the government to the ALJ. So at the time that your client waived his right to a hearing, he was aware that the government could introduce affidavits or declarations from these witnesses in the proceeding, right? I don't know if he was aware that they could introduce affidavits that were new information in a paper proceeding, if we call it that, without a hearing. I don't know that he actually knew that. The problem is that he was prevented by the ALJ. Let's assume that he was aware that the government could introduce new declarations and affidavits when he waived the right to a hearing. If that's true, I'm not sure that I understand why the Court are denying him the depositions is error. So it would still be error because of what we have here, because of this situation. So he is asked, he asks repeatedly, and the agency doesn't object necessarily to all of it, to depose each of these witnesses. He is, and in fact, the ALJ doesn't rule on this at all until a footnote on page 2 of the appendix in her decision, which she summarily says no. But he goes into this knowing that they're going to have these witnesses, asking to depose them. It's no different, because if he had gone to a hearing, they'd still have these surprise witnesses saying what they're saying for the first time. I think the lack of... At the hearing, he would have the right to cross-examine. But without knowing what they would say beforehand, and that's kind of like the Ramirez case. He knew what the affidavits contained. He didn't know what they contained beforehand. That's the problem. So a lot of these allegations... He did not have copies of the affidavits? Not at the time of the... No, the affidavits were attached to their submission to the ALJ for the very first time. Beforehand, he did not have any copies of those affidavits. And that's why this is like a Ramirez problem. Because in Ramirez, there is a hearing, right? That's actually where there is a hearing. And before the hearing, the petitioner is unable to see this report from a psychiatrist, even though they can cross-examine the person on the stand. And this court reversed and held that the real problem is they weren't able to see this evidence beforehand. If Mr. Rino had indeed obtained those affidavits beforehand, he would have seen all this extra scurrilous information from the complaining witness that they harp on in their brief, allegations about violence and torture and stalking and bushes and things like that, that were never in the record before. And we address in our reply brief in spades. It's a Ramirez problem. He had to have notice of this before going into this proceeding, hearing or not. And with that, I'd like to reserve the rest of my time for rebuttal. Okay. Thank you, Your Honor. Thank you. Ms. Olson? Good morning. May it please the Court. We respectfully request that the Court affirm the decision of the Board. The Board considered and rejected Mr. Rino's affirmative defense of a due process violation. First, it found that there was no due process violation related to these alleged ex parte communications. And the deciding official testified in this sworn affidavit that he, in making his decision, he considered only the proposed notice, its exhibit. How do you distinguish McGuffin on this first point, on the ex parte information? Certainly, Your Honor, that. Witness who said one thing and then he changed, right? Your Honor, so. Wasn't that involved with McGuffin also? Your Honor, we disagree. This is, as we explain in our brief at pages 32 to 36, we explain that the deposition testimony was all based on some confusion that Mr. Rino had. I understand that. But you don't discuss McGuffin in your brief, right? That is true, Your Honor. We do not discuss McGuffin. How do you distinguish McGuffin? Because, Your Honor, here it is not a direct contradiction. There is a, the statements made in the deposition arose out of a confusion because he was accepting Mr. Rino's statement that the statements were in the set of materials he reviewed. And he was clear that he had reviewed that set of materials. It was 1,300 pages. And I think part of the confusion was simply because the statements were part and parcel to evidence that was already there. And so the statement, he later clarifies this in his affidavit. And so we do not think that this is the same as McGuffin because here it is not a changed story. It is a clarification of a confusion. And, again, all of these details were, these arguments were presented to the administrative judge who then made a determination and accepted the statement in the affidavit that the determining decision maker considered one set of materials, which was the notice, the supporting evidence, which was approximately about 1,300 pages, and then Mr. Rino's submissions. As for the second set of alleged ex parte communications, to be clear, we weren't arguing that Mr. Iverson, Colonel Iverson didn't know about the 2013 charges. In our brief, we were dealing with whether there was a conversation with Mr. Dills and when exactly it occurred. Did he know about the affidavits of the witnesses? Your Honor, we know that he becomes aware of the statements of those police statements, but it's not clear. He knew about it. He did know. It's not clear when he knew. Did he give a copy to his client? Your Honor, Mr. Rino received the statements later in discovery. It is not established that Colonel Iverson had the statements before then. So he does become aware as the case proceeds. It is not established in the record clear one way or the other if he had them. Let me ask you a different way. Copies were never given to Mr. Rino's client or to Mr. Rino, correct? They were given in discovery. They were not given before the removal decision. But it's not established that Colonel Iverson had them before the removal decision. But somebody had them. Somebody made them, drafted the affidavits, got the sworn testimony, helped the witnesses. Somebody was doing that. I don't understand why a copy just can't be sent over to the other side. So, Your Honor, these are sworn statements given to them. Isn't that what due process is all about, giving notice and opportunity? I agree with you, Your Honor, that it's about notice and opportunity. These were sworn statements given to the military police about the 2013 misdemeanor charges in the county, which is a separate proceeding than what was happening with Colonel Iverson. Colonel Iverson said he does not—it's not established when he received those copies. So as far as we're aware, he did not have them in advance. They came up—they were obtained in discovery, and then that is when they were shared with Mr. Rino. So these are statements, again, that were arising from the military police's—given to the military police. And so I believe it's the military police who assisted the witnesses in creating these sworn statements. That was not something that the individuals involved in the removal proceedings. So these are two separate things. But during discovery, the statements are obtained and then shared. What about the declarations that were introduced into evidence in the proceedings before the administrative judge? Yes, Your Honor. Was Mr. Rino aware at the time he waived the right to a hearing that the government would introduce additional declarations? So, Your Honor, at the time that he waived a hearing, I cannot speak to what Mr. Rino's subjective knowledge was. When he indicated— I'm asking about that. I'm asking what the record shows. Yes, Your Honor. So the record shows—so first of all, these witnesses were all listed on the agency's March 8, 2017 witness list. And then at the November pre-hearing conference—I want to make sure I'm speaking to when this conversation occurred. One moment. When Mr. Rino first indicated that he might withdraw his hearing request, the administrative judge advised him that the parties would have an opportunity to submit written evidence and arguments for consideration. If the hearing is waived, the testimony from those witnesses simply must come in through affidavits and declarations. So all of the witnesses, they were listed on the agency's witness list. Again, that was back in March. So was the hearing waived—the parties put in their submissions simultaneously? No, Your Honor, and that's a very important point. So here, the administrative judge set two separate deadlines and had the agency's record closed first, and then Mr. Rino's record closed a week later. So if there's any surprises in these affidavits, if there's any surprises in the evidence, Mr. Rino had a full week to prepare and then submit as part of his submission any evidence, which could include an affidavit of himself or additional evidence in response to those affidavits. So Mr. Rino absolutely had an opportunity to respond to the content of these affidavits. He renewed his request to depose those people, too. Yes, Your Honor, he did renew his request to depose these folks. He did renew it? So he—I'm sorry. He could or did? So he—in the timeline, he had not requested these particular depots before the pre-hearing conference. He requested them on December 10th for the first time, and he later does mention his request again later when he requested it. How does December 10th fit into the timeline? Was that after the declarations were submitted? No, Your Honor. It was after the pre-hearing conference. My only point is that the administrative judge— So he didn't make the request for the depositions after the declarations were actually submitted? No, Your Honor. He had made them before and then— And then waived the right to the hearing. Yes, Your Honor. And he waived the right to the hearing while his request for the depositions was pending. And so if finding out the resolution was important for his decision on whether to waive the hearing, I would simply suggest it might— Did the AJ ever consider whether the ex parte communications that were introduced were new and material evidence? So, Your Honor— Did he make that analysis as new and material evidence? No, Your Honor. Because the administrative judge found that the decision maker did not consider them, the administrative judge never reached the question of whether they were new and material, and so therefore did not get into the stone factors. As for the— As far as the hearing goes, we also just wanted to note one thing, which is there's a distinction between the six depositions that were requested versus— Then there was a seventh mentioned, which is the C.A. affidavit. And we simply note that Mr. Rino did have an opportunity to depose C.A. He deposed her six times in prior proceedings, and then the administrative judge granted his request to have a seventh deposition specifically for this case. And that depo did not occur because Mr. Rino's attorney failed to appear, and that's at Appendix 3488. And so the administrative judge found that Mr. Rino waived his right to depose C.A. for a seventh time. So he did, in fact, have an opportunity to depose her. So we just wanted to clarify that for the record. But again, he had the opportunity to respond to all of the evidence in the affidavits because the administrative judge set the agency's close of record deadline a week later. Your Honor, there was no mystery here. Going back to the ex parte communications, Mr. Rino was notified in writing of the charges against him, had a detailed description of each and every specification, and then a lengthy record of supporting evidence. And then he had an opportunity to respond. So we submit that due process has been satisfied. If there's no further questions, because substantial evidence supports the Board's decision, we respectfully request the Court affirm the decision below. Thank you. Okay, thank you. Mr. Sternberg. Yes, Your Honor. Let me clear up. My opponent started saying that there was not a direct contradiction when Your Honor asked about McGuffin. It's just not. And that this was just confusion by Colonel Iverson. That's just not true. They argued, and Colonel Iverson says for the first time in this affidavit, that he was flummoxed, I guess, into thinking that these statements had actually been in the record before him. That's not true at all. He was asked directly, and this is pages 4689 to 90 of the appendix, what he had relied on, what materials he had relied on in making these decisions about statements about these November 8th and 9th incidents. And he says, I believe the fact that there were witnesses there who I believe corroborated CA, and that he learned this because he had spoken with Mr. Dills. And then he's shown these statements and he's asked, are these them? And he says that, yes, that they supported his determination as to the specifications related to those alleged incidents. And then later on, again on page 4808, which my opponent did not correct in her statement to the court, he says, he's asked again, were these statements from Smith and Dodd considered? And he said they were considered obviously. I don't know how this is not a direct contradiction. Is the distinction between this case and McGuffin that at McGuffin it was unexplained contradiction, whereas here there was an explained contradiction, at least in the government's theory? I don't think so, Your Honor. I think actually McGuffin's on all fours. In McGuffin, it was a USERRA case, and the question is whether this veteran had been removed for an improper reason. And the witness said, well, no, I didn't remove him for an improper reason. It was poor performance. But the court was able to look at all the prior communications and say there's no evidence of poor performance. And, in fact, the evidence is to the contrary, and they found that the government had not actually met that burden there. And so that's the problem we have here. So the question is what substantial evidence shows. And the substantial evidence, not this later affidavit, after the due process problem becomes apparent, the substantial evidence shows that he did indeed rely on all of this. And, again, they haven't addressed any of these other communications from Mr. Dills. I see my red light is on. We'd ask the court to order a new removal proceeding. Okay. Thank you. Thank both counsel. Thank you, Your Honor.